**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL ACTION NO. 5:14-CV-00200-RLV-DSC**

| | | |
|---|---|---|
| REBECCA SMITH, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| WOODCRAFT INDUSTRIES, INC., | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**BEFORE THE COURT** is Defendant Woodcraft Industries, Inc.'s Motion for Summary

Judgment. (Doc. 18). Plaintiff has filed a response brief, (Doc. 30), to which Woodcraft has

replied, (Doc. 35).

On December 24, 2014, Plaintiff filed a Verified Complaint bringing the following counts:

(1) sex discrimination in violation of Title VII, as amended, 42 U.S.C. § 2000e, *et seq*., 42 U.S.C.

§ 1981A, *et seq*.; (2) retaliation in violation of Title VII; (3) intentional infliction of emotional

distress; and (4) negligent supervision and retention of an employee.

**I. STATEMENT OF FACTS**

The Court notes that Plaintiff did not include a Statement of Facts in her response brief.

Instead she stated that "[t]he facts are as set forth in the Plaintiff's Verified Complaint,[1] as set

below and attached to Plaintiff's Response to Defendant's Motion for Summary Judgment."

(Doc. 30-1, at 1). Plaintiff's response brief is twenty-five pages long. The documents attached

are over three hundred and eighty pages. This type of practice is disfavored and needlessly

---

[1] "[A] *verified* complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). Accordingly, it is proper to cite to the Verified Complaint at this stage.

prolongs this Court's consideration of the instant motion.  *Propst v. Hws Co., Inc.; And Sherrill Furniture Co.,* No. 5:14CV00079RLVDCK, 2015 WL 8207464, at *2 (W.D.N.C. Dec. 7, 2015) (Voorhees, J.).

Woodcraft is a Minnesota corporation that manufactures kitchen doors and components. (Sheila Krogman Aff., Doc. 21, at ¶ 2); (Compl., Doc. 1, at ¶¶ 12-13).  Woodcraft has a manufacturing facility in Conover, North Carolina (the "Conover facility").  (Doc. 21, at ¶ 3); (Doc. 1, at ¶ 13).  In January 2010, Plaintiff was hired as a Warehouse Coordinator in the door department.  (Doc. 21-1, at 3); (Doc. 1, at ¶ 18).  Plaintiff was hired by Brian Ernst ("Ernst"), (Doc. 21-1, at 3), who, at all times relevant to this lawsuit, held the title of Plant Manager of the Conover facility, (Doc. 1, at ¶¶ 16, 19).

Plaintiff's position as Warehouse Coordinator involved assisting with inventory and shipping.  (Dep. of Rebecca Smith, Doc. 20-1, at 83:17 – 84:11).[2]  However, she did not continue working as a Warehouse Coordinator for long.  After a few weeks, Plaintiff moved to a production position that involved building and assembling doors.  *Id.* at 86:16-22.  At first, Plaintiff got along with Ernst.  (Smith Dep., Doc. 30-2, at 123:7).  However, she began experiencing issues with Ernst when she changed positions.  *Id.* at 10-15.  In the production position, she was responsible for gluing, clamping and nailing doors.  *Id.* at 88:16-24.  All of these activities occurred on the production floor, which is an open area where all production employees work together.  *Id.*  Ernst was always on the production floor and Plaintiff had frequent interaction with him.  *Id.* at 89:4-16.

Ernst was the highest ranking employee at the Conover facility and oversaw production at the plant.  *Id.* at 91:22 – 92:6.  Ernst reported to a superior in Minnesota.  *Id.* at 92:7-14.

---

[2] Some depositions on file have four pages of transcript per sheet.  The Court will always cite to the exact page of the deposition instead of the sheet in which it is located.

In July of 2011, a new position titled Quality Team Lead inspection position was created. *Id.* at 100:14-15. The position was created because the Conover facility was experiencing quality control issues, including problems with joints on doors not holding together because only minimal amounts of glue were being applied. *Id.* at 100:17 – 101:9. In particular, one of the largest customers for the Conover facility, UltraCraft, had complained. *Id.* at 101:22 – 102:22. The position was designed to ensure that the doors met quality standards because Woodcraft could lose customers. *Id.* at 103:-11 – 104:10.

Plaintiff had favorable performance reviews prior to the creation of the Quality Team Lead inspection position. (Doc. 21, at ¶ 4). Ernst told Plaintiff about the position and then she "bid" or applied for the job. (Doc. 20-1, at 92:17-22). As part of this process, she travelled to a facility located in St. Cloud, Minnesota in March of 2011 for several days. *Id.* at 93:17 – 94:25. The purpose of this visit was to lend understanding as to how the St. Cloud facility operated, including gluing procedures. *Id.* at 95:5-21. Plaintiff was taken to the production floor of the facility. There she spoke to employees and took a multitude of pictures of how the employees glued the doors. *Id.* at 97:4-15. She also spent less than a full day with the quality control team, discussing the same type of processes. *Id.* at 97:24 – 98:3. She was expected to incorporate these processes in the Conover facility. *Id.*

In April 2011, Woodcraft sent Quality Auditor Lynne Revermann from Minnesota to the Conover facility to train Plaintiff. (Doc. 21, at ¶ 5). She spent four days in the Conover facility training Plaintiff, pointing out what would pass inspection and what would not. (Doc. 20-1, at 98:16 – 99:17). On July 14, 2011, Quality Supervisor Ben Huhn traveled to North Carolina to audit Plaintiff's knowledge of quality procedures. (Doc. 21, at ¶ 6); (Doc. 20-1, at 100:1-10). Plaintiff successfully passed the audit and was formally hired into the Quality Team Lead

position by Ernst effective July 19, 2011.  (Doc. 21, at ¶ 7); (Doc. 20-1, at 92:15 – 93:5).  This

hiring resulted in a pay raise and a promotion for Plaintiff.  *Id.*  Prior to the creation of this

position, the Conover facility did not have quality control procedures.  (Doc. 20-1, at 101:10-15).

As stated earlier, Plaintiff was expected to implement these procedures as part of her new

position.  *Id.* at 103:8-20.  Plaintiff received a favorable performance review for January 5, 2012.

(Ernst Dep., Doc. 30-4, at 156:6-21).

### A.      Plaintiff's Allegations

The Court is required to assume the following facts to be true in the context of the instant

motion.  On or about July 26, 2012, Ernst stated to Plaintiff "'if you don't stop I am going to

have to go to the bathroom.'  Plaintiff asked 'stop what?' Ernst replied[,] '[b]ending over in front

of me.'"  (Doc. 1, at ¶ 25).  Plaintiff then responded "if you don't stop talking to me like this I

am going to start recording you."  *Id.*  Ernst then stated "what so you can turn me in?"  *Id.*

Plaintiff responded "No, just to let you listen to the way you talk to me and then maybe you will

stop.  I don't like it."  *Id.*  After this incident, Ernst avoided speaking to Plaintiff.  *Id.* at ¶ 6;

(Doc. 30-2, at 150:17 – 151:15).

On other unspecified dates, Plaintiff states that the following incidents occurred:

- Ernst told her, "[Y]ou used to wear thongs now you wear granny panties."  *Id.* at ¶ 27.[3]
- If a boss from Woodcraft or UltraCraft would visit the Conover facility, Ernst asked her to wear a low cut shirt in an attempt to distract them from asking Plaintiff questions.  *Id.* at ¶ 28.
- Ernst asked Plaintiff multiple times if she was "petting the puss."  *Id.* at ¶ 29.  He also asked male employees if they were "dicking the dog."  *Id.*
- Ernst told Plaintiff that she used to look good and dress nicer when she worked for a former employer and "what the hell happened[?]"  *Id.* at ¶ 30.

---

[3] In her deposition, Plaintiff claims that this could have occurred "one or two times."  (Doc. 30-2, at 131:12-14_.

Plaintiff admitted that she did not report any of Ernst's alleged comments to anyone in Human Resources or any company manager.  (Doc. 20-1, at 163:1-8).  She stated that she did complain about this behavior to Carol Freeman, Candace Young, and an employee named Mary. *Id.* at 164:5-11.

Plaintiff alleged generally in her Verified Complaint that "Ernst engaged in a pattern of conduct that included making unwelcome sexual advances towards female subordinates."  *Id.* at ¶ 38.  She continued stating that said "advances . . . were known to [Woodcraft's] management who failed to take appropriate action to investigate his misconduct, and prevent him from making [further] . . . advances."  *Id.* at ¶ 39.  These allegations will <u>not be credited</u> at this stage because Plaintiff has no basis for stating them.  When asked about the basis for these allegations she stated that "I feel they knew.  I feel - - I feel that they knew."  (Doc. 20-1, at 191:10-14).  When asked about proof she stated, "No, I don't have any proof they knew."  *Id.* at 191:13-14).

To substantiate these allegations, Plaintiff offers former employees Carol Freeman and Candace Young.  Freeman has had two separate periods of employment with Defendant, first from April 2, 2008 through October 3, 2008.  She was rehired in October 2010 and worked through November 2011.  (Doc. 22, ¶¶ 16-17).  Young was only employed with Defendant from August 31, 2011 to November 17, 2011.  (Doc. 22, ¶ 13).  Accordingly, Freeman and Young do not have personal knowledge of certain events, namely the reject issues precipitating Plaintiff's termination because they were not working for Defendant in 2012.[4]

Carol Freeman states that Ernst "made sexual passes and jokes to female employees and I myself was told by Brian Ernst that I was hired because of my great 'rack' meaning my breasts."

_____

[4] Their testimony; however, may be relevant in proving intent.  *See Buckley v. Mukasey*, 538 F.3d 306, 319 (4th Cir. 2008).

(Doc. 30-10, at ¶ 7).  She continued, stating that he sent her text messages that contained cartoon sexual content; constantly talked about sexual matters; would make a "perverted face" while looking at female employees; and continually made "dirty" comments to female employees, including Plaintiff.  *Id.* at ¶ 8 – 12.  In her deposition, Freeman admitted that she never reported any concerns about Ernst.  (Doc. 20-2, at 83:3-10).

Candace Young's affidavit states that Ernst would make sexually inappropriate comments towards her and then state "oh I better hush or you will turn me in."  (Doc. 30-11, at ¶¶ 4-5).  She mentioned one incident where she bent over in front of Ernst and Ernst made "a rude and sexual comment about my pants showing my butt crack."  *Id.* at ¶ 11.  She asked Ernst not to make that comment and after this Ernst became quiet and distant.  *Id.* at ¶¶ 12-13.  She was fired a few days later for not working on a Saturday, even though Ernst knew that she was not able to come into work.  *Id.* at ¶ 14.  In her deposition, Young admitted that she never told management of the sexual remarks made.  (Doc. 20-2, at 38:25 – 39:3).

## B.  Defendant's Sexual Harassment Policy and Training

It is undisputed that, during Plaintiff's employ, Woodcraft received no sexual harassment complaints about Ernst or the Conover facility from any other employees.  (Wittrock Aff., Doc. 22, at ¶ 7).

Plaintiff received an employee handbook that had a harassment and offense behavior policy in it when she was hired.  (Doc. 20-1, at 165:17 – 166:7).   Plaintiff participated in sexual harassment training on January 21, 2011.  (Doc. 20-1, at 166:16 – 167:7).  Julie Wittrock ("Wittrock"), a human resources employee, came to the Conover facility to conduct the training.  *Id.* at 167:7-11.  Plaintiff also participated in a second training in January 2012.  *Id.* at 169:1-5.

The Employee Handbook in question specifically prohibited sexual harassment. (Doc. 22-1, at 5). It instructed employees to "promptly report" prohibited activities in the following manner: (1) to tell the offender that the conduct is offensive, to stop, and that it violates the policy; and (2) "[a]dvise your supervisor, or another member of the management team, that you are experiencing" said conduct." *Id.* at 5.

The Conover facility did not have a HR department in residence. (Doc. 1, at ¶ 32). Plaintiff claims that she was "fearful" of reporting her complaints to HR in Minnesota because she did not trust Wittrock. (Doc. 20-1, at 174:20 – 178:15); (Pl's Opp. Br., Doc. 30-1, at 7, 9). In her deposition, Plaintiff bases her fear from second-hand information relayed to her by another employee. Specifically, Plaintiff was informed by Carol Freeman that Freeman and Mary had previously spoken with Ms. Wittrock regarding problems, including Ernst. (Doc. 20-1, at 173:2 – 174:6). Freeman told her that Wittrock could not be trusted because Wittrock repeated the substance of the conversation to Ernst. *Id.* at 174:20-24. Plaintiff could not recall what they told Wittrock, other than it was about Ernst, and could not recall when it occurred other than it was after one of the sexual harassment meetings. *Id.* at 175:3-23. Plaintiff has no knowledge of whether Wittrock was asked to keep the conversation confidential. *Id.* at 176:16 – 177:6. Again, Freeman never reported concerns about Ernst to Wittrock. (Doc. 20-2, at 83:3-5). Freeman did raise concerns about an employee who was using racial remarks. *Id.* at 81:20-25. Freeman "understood" that Wittrock and Ernst had a conversation regarding what Freeman told Wittrock but Freeman was not present for the conversation and could only generally state that she had a conversation with someone else who told her that. *Id.* at 84:8-25. Freeman shared with Plaintiff that this had occurred, *id.* at 83:15-18, and specifically told Plaintiff not to trust Wittrock because Freeman "knew how buddy-buddy Julie and Brian were," *id.* at 85:17-18. The

substance of Freeman's testimony is that Ernst and Wittrock were too friendly and that it was not professional for Wittrock to be friends with Ernst. *Id.* at 87:1-13.

Wittrock's affidavit states that "[c]ompany phone numbers, including those of Human Resources employees, were posted at the Conover facility during Ms. Smith's employment and were also available through the internet." (Doc. 22, at ¶ 6).

Richard Gattrell, a former employee of Defendant stated that you cannot make a written complaint or complaint of any kind because "there's no checks and balances [at the Conover facility]." (Dep. Gatrell, Doc. 30-6, at 49:12-17). He did state that he had the direct numbers to human resources in Minnesota. *Id.* at 49:18-21. He stated "there's a number there . . . I didn't call it . . . I understand how things work down there. There's no checks and balances, as far as Brian Ernst goes . . . anything that comes up is your word against his and there's no other supervisor to contradict anything he has to say." *Id.* at 50:9-16. "[R]egardless of what the handbook says, if I make a complaint it's going to cost me my job." *Id.* at 17-20.

Smith stated that the phone numbers were not posted in the work area and instead were only in the office. (Doc. 20-1, at 171:3-14). She states that "I could have snuck in there and got it, but I - - that was not doing the right thing I didn't feel." *Id.* at 171:15-16. She admitted that she had a key to the office; that she was the first one to arrive and upon up the facility; and that she could have gone into the office but did not "because it was not my area to go into." *Id.* at 172:3-9.

### C. Performance Issues

Much of Defendant's brief concerns Plaintiff's performance during the time in question. Sheila Krogman is the Director of Human Resources for Defendant. Her affidavit states that "[a]fter Smith's July 2011 promotion to Quality Team Lead, the Conover facility continued

to have product quality problems of varying degrees." (Doc. 21, at ¶ 9). She states that Ersnt addressed lapses in procedures and late shipping with Plaintiff and cites Exhibit 5 to the affidavit as the underlying documentation. *Id.* Exhibit 5 contains a handwritten note dated October 10, 2011 and signed by Ernst that states that he told Plaintiff that "she needs to make sure that she is filling out the quality rejection sheet for doors every day." (Doc. 21-1, at 18). He also states that she needs to follow Woodcraft procedures. *Id.* The next page is an "Employee Corrective Action Report" from late October indicating that Plaintiff received a written warning relating to orders that needed to be shipped on October 24, 2011. *Id.* at 19. It states that the order was not shipped on time and that several rush orders were still missing when extra time was given. *Id.* Plaintiff's name is signed on the page. *Id.* However, Plaintiff claims she does not recall ever having said conversation on October 10. (Doc. 30-2, at 199:24 – 200:8). Plaintiff further states that the signature is not hers and she never received the warning mentioned above. *Id.* at 202:22 – 203:2. Given the standard of review, the Court is required to credit Plaintiff's statements.

By early 2012, the Conover facility had experienced some improvement in quality, and Plaintiff received a favorable performance review and a pay increase from Ernst. (Doc. 21, at ¶ 10); (Doc. 21-1, at 21-23).

In the summer 2012, quality control issues increased. (Doc. 21, at ¶ 11). Defendant supports this assertion by citing to UltraCraft's rejection numbers. Defendant claims that these records show that "[f]or the month of June 2012, Woodcraft's records reflect that the level of product rejected by UltraCraft had increased approximately eight percent (8%) over the recorded April and May 2012 figures." *Id.*[5]

---

[5] Counsel or the affiant should have stated how this figure was computed. After a series of calculations, the Court can only conclude that Defendant's 8% figure **substantially undervalued** the increase in rejections.

In June 2012, Defendant also received two Quality Concern Reports from UltraCraft about rejected product. (Doc. 21, at ¶ 12). Further, Ernst received an email from an UltraCraft contact regarding product quality issues. (*Id.* at ¶ 13). The email stated that:

> I really have to wonder what is going on . . . our rejects are growing. The veneer in the recessed panel doors looks like crap. Are we ordering more than you can handle?
> There are several doors in the reject bin and now we have orders with six or seven rejects per order. . . . Please get on top of it quickly!

(Doc. 21-1, at 31).[6]

Defendant maintains that based on the growing quality problems and related pressures being placed on the Conover facility in June 2012, Ernst hired another employee, James Scott, to assist with production work to enable Plaintiff to have more time to perform quality inspection work. (Doc. 21, at ¶ 14) (Ernst Dep., Doc. 20-1, at 81:4-11). Scott started in June 2012. (Doc. 21, at ¶ 14). On July 26, 2012, Defendant had twenty-four doors rejected. (Doc. 30-3, at 51:12 – 52:3). According to Ernst, some fifty were still in customers hands and were later shipped back due to quality issues. *Id.*

On July 30, 2012, Defendant received another Quality Concern report form UltraCraft stating that it was rejecting "multiple" or a "large batch" of Shaker doors. (Doc. 21-1, at ¶ 15, 33-39). There were open and loose joints in the doors. *Id.* Ms. Krogman states that this rejection was reflected in the facility's August 2012 recorded rejection numbers, which made June and August have the highest rejection rates at that time. (*Id.*).[7] If the July 30 rejection is reflected in August, this is true. *Id.* at 26. The charts were prepared by a quality supervisor of Defendant.

---

[6] One of the Quality Concern Reports, concerning veneer issues reported on June 6, 2012, states that the "root causes" of the veneer issues are "[i]nherent defects." (Doc. 21-1, at 29). The Report concluded that the "slight Vinning" was "acceptable to HPVA standards." (*Id.*). At this stage, it is difficult to attribute inherent defects in the product to Plaintiff.
[7] The import of Krogman's conclusion is discussed in the body of the opinion.

(Dep. of Ernst, Doc. 30-4, at 185:1-2). Plaintiff's attorney vigorously cross-examined Ernst about the preparation of this document.

Defendant cites Ernst's deposition to prove that a meeting occurred to speak about the problems with these doors (Doc. 19, at 6); however, Plaintiff categorically denies ever having said meeting. (Doc. 20-1, at 217:1-23). The conversation, according to Defendant, elicited facts tending to show that Plaintiff admitted that she knowingly violated company policy by telling an employee, Lisa Harmon, to improperly apply the glue and that Plaintiff stated "I knew we would get some doors back buy not this many." (Doc. 19, at 6). Plaintiff categorically denies these assertions and states that she was telling Harmon to wipe excess glue off, but not to improperly apply the glue in contravention of company policy. (Doc. 20-1, at 219:7 – 222:24).

Ernst then initiated a process that ended in Plaintiff's firing. (Ersnt Dep., Doc. 30-4, at 164:23-24). Ernst told his (now Woodcraft's) version of the conversation to his supervisor, Ray Wasser, Defendant's Operations Manager, and the substance of this conversation was ultimately disclosed to Krogman. (Doc. 21, at ¶ 16). Krogman and Wasser heard Ernst recount that (1) Plaintiff told Harman to violate Defendant's gluing procedures and (2) Plaintiff commented to another employee that she knew the doors were defective and that some would be rejected, but she had not realized that so many would be rejected by UltraCraft. *Id.* After hearing this, and considering the ongoing quality problems, all three concurred that Plaintiff's employment should be terminated. *Id.* Plaintiff was fired on August 6, 2012. *Id.* at ¶ 17. The Corrective Action Report memorializing her termination states as follows:

> Doors reached our customer last week that did not meet their quality specifications. It was Rebecca's responsibility as Quality Area Lead to inspect all doors leaving the plant. Rebecca's job has recently been modified to allow her more time to concentrate on inspection. Her failure to catch the quality issues shows a disregard for her employer's interests. Business may be lost at this customer or at the very least we will need to rebuild their trust.

(Doc. 20-1, at 41).

Richard Gattrell, a former employee, claims that "[f]rom the day I got here until the day I left [there were a constant number of rejects]." (Doc. 30-6, at 39:7-10). He also claims that employees at Defendant would routinely inform Ernst of issues with the product but Ernst would tell them to ship it in order to complete the order. *Id.* at 40:7-18. Ernst denies telling employees to ship the doors out despite having defects. (Ernst Dep., Doc. 30-3, at 54:15-23). Ernst did state that doors were always shipped on the date they were supposed to be shipped, but sometimes this occurred an hour or two later than projected. *Id.* at 55:15-21. Gattrell claimed that taking the quality inspection position at Defendant during this time period was "a short train to getting fired" because they were "handcuffed" because of Ernst's method of management of the Conover facility. (Doc. 30-7, 84:12 – 85:5).

## THE LAW

II.    EXHAUSTION OF REMEDIES

Defendant first argues that Plaintiff failed to sufficiently exhaust her administrative remedies, stating that "the alleged July 26, 2012, 'bend over' comment was the *only* sexual comment by Ernst alleged in Smith's EEOC charge document." (Doc. 19, at 12). Plaintiff did not file the EEOC charge with her complaint but rather only filed the Dismissal and Notice of Rights. *See* (Doc. 1). The entirety of the Charge is filed as Exhibit 8 to Wittrock's Affidavit. *See* (Doc. 22-1, at 38).

"Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 9623 (4th

Cir. 1996). This rule allows "[t]he allegations contained in the administrative charge of discrimination [to] generally operate to limit the scope of any subsequent judicial complaint" but recognizes that "lawyers do not typically complete the administrative charges." *Id.* at 509 (citations omitted). It is clear that a plaintiff may not file initially under race and then introduce in court a new basis, such as sex. *Id.* Further, a shift in types of discrimination will also be barred. For example, if the charge alleges discriminatory failure to promote but at trial the plaintiff alleges discrimination in failure to pay, the new charge will be barred. *Id.* When a plaintiff's EEOC charge "describe['s] only a single act of age, race, and sex discrimination" then claims for retaliation or hostile work environment are not properly exhausted even if included in the complaint filed with the district court. *Shipman v. United Parcel Serv., Inc.*, 581 F. App'x 185, 187 (4th Cir. 2014) *cert. denied,* 135 S. Ct. 981 (2015); *see also Chacko*, 429 F.3d at 509 ("we have held that the allegation of a discrete act or acts in an administrative charge is insufficient when the plaintiff subsequently alleges a broader pattern of misconduct.") (citing *Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 153, 156-67 (4th Cir. 1995)).

Here, Plaintiff checked the boxes for discrimination based on sex and retaliation. (Doc. 22-1, at 28). She stated that the earliest date of discrimination was August 6, 2012 and the latest date of discrimination was August 6, 2012. *Id.* She did not check the continuing action box. *Id.* She only alleges a single sexual comment, her objection to it, and subsequent firing. *Id.* In fact, the narrative would lead a reasonable investigator to conclude that a single instance of discrimination had occurred because she discussed when she began working, January 4, 2010, and her promotion. *Id.* No allegations that would give rise to an inference of a pattern of sexual comments was included. *Id.* The charge does not allege a series of sexually discriminatory remarks by Ernst that would give notice to Defendant that there was a hostile work environment

present. There is no indication that the workplace permeated with discriminatory conduct. The Court finds that statements added to Plaintiffs' complaint that give rise to her hostile work environment claim are not reasonably related and would not develop under a reasonable investigation of the charge. Courts in similar circumstances have found that a claim for hostile work environment is not properly exhausted in circumstances similar to this. *Finlay v. Fortis Inst.-Towson*, No. CV JKB-15-1184, 2015 WL 5920905, at *5 (D. Md. Oct. 8, 2015); *Bannister v. Wal-Mart Stores E., L.P.*, 843 F. Supp. 2d 610, 617 (E.D.N.C. 2012); *Guion v. Mabus*, No. 4:11-CV-159-F, 2012 WL 1340117, at *7 (E.D.N.C. Apr. 17, 2012); *Muir v. Winston-Salem State Univ.*, No. 1:11-CV-282, 2012 WL 683359, at *8 (M.D.N.C. Mar. 2, 2012); *Balas v. Huntington Ingalls Indus., Inc.*, No. 2:11CV347, 2011 WL 4478864, at *5 (E.D. Va. Sept. 26, 2011).

## III.    HOSTILE WORK ENVIRONMENT

A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). To establish a hostile work environment claim, a plaintiff must show that there is (1) unwelcome conduct; (2) based on the plaintiff's [sex]; (3) that is sufficiently severe or pervasive enough to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) that is imputable to the employer. *Boyer-Liberto*, 786 F.3d at 277.[8]

---

[8] Although Plaintiff claims that she was subjected to *quid pro quo* discrimination, the Court finds that the claim is appropriately characterized as a claim for hostile work environment. *Langley v. Dolgencorp, LLC*, 972 F. Supp. 2d 804, 821 (D.S.C. 2013) ("Quid pro quo liability exists where "a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands."). "*Quid pro quo* sexual harassment occurs when an employer conditions, explicitly or implicitly, the receipt of a job benefit or a tangible job detriment on the employee's acceptance or rejection of sexual advances." *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 416-17 (D. Md. 2015) (quoting *Reinhold v. Virginia*, 135 F.3d 920, 931 (4th Cir. 1998), *opinion withdrawn and*

A.    Severe and Pervasive

Defendant first argues that Plaintiff cannot establish that the severe and pervasive prong and the Court agrees.

With regard to the severity or pervasiveness of the conduct at issue, this element must be examined under a "totality of the circumstances" standard. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001). "Relevant considerations 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *See Spriggs*, 242 F.3d at 184 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The Court also considers the status of the harasser, "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." *Boyer-Liberto*, 786 F.3d at 278 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998)). To be actionable, the conduct must create an objectively hostile or abusive work environment, and the victim must also perceive the environment to be abusive. *Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177, 183 (4th Cir. 1998). While "viable hostile work environment claims often involve repeated conduct[,] . . . an 'isolated incident' of harassment can 'amount to discriminatory changes in the terms and conditions of employment,' if that incident is 'extremely serious.'" *See Boyer-Liberto*, 786 F.3d at 277 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)) (internal citations and changes in original omitted). However, complaints "premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference

<hr />

*superseded by* 151 F.3d 172 (4th Cir. 1998) (vacating earlier judgment in light of *Ellerth*). There is no evidence that Ernst or anyone else conditioned the receipt of a job benefit premised on Plaintiff's acceptance or denial of sexual advances.

of opinion and personality conflict with one's supervisor are not actionable under Title VII." *Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007).

Plaintiff was hired in January 2010 and fired in August 2012; therefore, she worked for Defendant for two years and seven months. She has only properly alleged a single sexual comment. This was an isolated statement. The statement was not physically threatening nor was it a proposition. The Court finds that while this comment was highly inappropriate, it is not sufficiently severe to change the terms and conditions in Plaintiff's employment. There is no indication that it unreasonably interfered or affected Plaintiff's work performance, because her response was to record Ernst just to show him that she did not like the way he talked to her and not to actually turn him in to management. In *Whitten*, the Fourth Circuit opined that the following statements over a period of two days from a male supervisor to his subordinate could not by themselves support a hostile work environment: (1) if the subordinate wanted long weekends off "she needed to be 'good to [him] and give [him] what [he] wanted"; and (2) "that he would make her life a 'living hell' if she ever took work matters 'over [his head]."" *Whitten v. Fred's, Inc.*, 601 F.3d 231, 236 (4th Cir. 2010) *abrogated on other grounds by Vance v. Ball State Univ.*, 133 S. Ct. 2434, 186 L. Ed. 2d 565 (2013). This Court finds that Plaintiff has not cleared the "high bar" required for a hostile work environment claim, *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008), and has not provided evidence even equivalent to that in *Whitten*. Accordingly, Defendant is granted summary judgment with regard to the hostile work environment claim. *Whitten*, 601 F.3d at 236; *Moret v. Geren*, 494 F. Supp. 2d 329, 342 (D. Md. 2007) (citing cases far more egregious than the instant one where situations were still insufficient to satisfy severe and pervasive element); *see also Silva v. City of Hidalgo, Tex.*, 575 F. App'x 419, 426 n.7 (5th Cir. 2014) (no hostile work environment claim where supervisor

told employee that "her pants were a little tight and that she looked good" and gestured by "h[olding] his hands in front of his chest as though he were holding something up[,]" and made comments such as "mmm" when she leaned over his desk."); *Ward v. D.C.*, 950 F. Supp. 2d 9, 22 (D.D.C. 2013); *Scarborough v. Brown Grp., Inc.*, 972 F. Supp. 1112, 1124 (W.D. Tenn. 1997) (the fact that speaker said nothing more after plaintiff indicated she was not interested was a factor weighing against hostile work environment).[9]

## IV.    RETALIATORY DISCHARGE

The retaliatory discharge claim will proceed to trial.

### A.    Prima Facie Case:

Plaintiff must prove the following in a Title VII retaliation claim:

> (1) that [she] engaged in a protected activity
> (2) that [her] employer took an adverse employment action against [her], and
> (3) that there was a causal link between the two events.

*DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015) (quoting *Boyer–Liberto*, 786 F.3d at 281).

The "anti-retaliation provision serves to 'prevent[ ] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).  This provision "encourage[s] the early reporting vital to achieve Title VII's goal of avoiding harm."  *Boyer-Liberto*, 786 F.3d at 283.

The provision prohibits retaliation against an employee who has "opposed any practice made an unlawful employment practice" by Title VII.  42 U.S.C. § 20003-3(a).   "The Supreme

---

[9] Even if the Court were to find that Plaintiff had actually exhausted her claim with regard to the prior acts, the Court would still find that these discrete acts do not give rise to an actionable hostile work environment claim.

Court has defined "oppose" in this context by looking to its ordinary meaning: to resist or antagonize ...; to contend against; to confront; resist; withstand, ... to be hostile or adverse to, as in opinion.'" *DeMasters*, 796 F.3d at 417 (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.,* 555 U.S. 271, 276 (2009)). "[T]he threshold for oppositional conduct is not onerous. Instead, '[w]hen an employee communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity.'" *Id.* at 417 (quoting *Crawford*, 555 U.S. at 276). The Fourth Circuit's expansive view of oppositional conduct encompasses complaining to management about an "unlawful employment practice." *See id.* Further, the Fourth Circuit broadly interprets the phrase "unlawful employment practice" to include not only actual unlawful practices but also "employment actions [she] reasonably believes to be unlawful." *Id.* (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015)). Further expanding the rule is that opposition can be made to a not yet fully formed, emerging hostile work environment. *Id.*

The Fourth Circuit distilled these requirements into the following rule:

> [A court] must examine the course of a plaintiff's conduct through a panoramic lens, viewing the individual scenes in their broader context and judging the picture as a whole. Although individual acts may be scrutinized to ascertain their nature, purpose, and nexus to the alleged objective, the touchstone is whether the plaintiff's course of conduct *as a whole* (1) communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination; and (2) concerns subject matter that is actually unlawful under Title VII" or that the employee reasonably believes to be unlawful.

*Id.* at 418 (internal citations and quotations omitted). The Fourth Circuit has stated that:

> [A]n employee is protected from retaliation for opposing an isolated incident of harassment when she reasonably believes that a hostile work environment is in progress, with no requirement for additional evidence that a plan is in motion to create such an environment or that such an environment is likely to occur. The employee will have a reasonable belief that a hostile environment is occurring if the isolated incident is physically threatening or humiliating.

*Boyer-Liberto*, 786 F.3d at 284.

Defendant did not move for summary judgment on this issue. Accordingly, for the purposes of this motion, the first element is satisfied.

The second element is that the employer took an adverse employment action. It is undisputed that Plaintiff was fired on August 6, 2012. It is axiomatic that discharge falls within the realm of tangible employment action. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 744 (1998).

The principal element of the prima facie case that Defendant challenges is causation. Plaintiff must show that there was a causal link between her complaint and her firing. Defendant makes two principal arguments regarding causation. First, Defendant claims that Plaintiff cannot establish causation because Defendant, through Ernst, continued to promote Plaintiff despite prior complaints of sexual comments. Plaintiff argues that the tight time nexus between the two events justifies an inference of causation. "Generally speaking, *temporal evidence alone* cannot establish causation for a prima facie case of retaliation, unless the 'temporal proximity between an employer's knowledge of protected activity and an adverse employment action' was 'very close.'" *Shields v. Fed. Exp. Corp.*, 120 F. App'x 956, 963 (4th Cir. 2005) (quoting *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (per curiam)). Here, the eleven days between the relevant dates is close enough to satisfy the causation prong of the prima facie case which is "less onerous" than its pretext counterpart. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 251 (4th Cir. 2015).

Defendant claims that intervening events, namely the July 30, 2012 rejection, break any inference of causation. In support of this claim, Defendant cites two unpublished Fourth Circuit decisions. The first, *Horne v. Reznick Fedder & Silverman*, found that a two month gap between

the protected activity and adverse action created a weak inference of causation that was more than rebutted by the fact that "prior to the protected activity, [the plaintiff] had been told that her performance was sub-par and that she should prepare to leave." 154 Fed. App'x 361, 364 (4th Cir. 2005). Defendant also cites *Ford v. General Elec. Lighting, LLC*, where the plaintiff's complaint occurred "more than three years before his termination." *Ford v. Gen. Elec. Lighting, LLC*, No. CIV.A.5:03 CV 00024, 2004 WL 1280679, at *2 (W.D. Va. Feb. 6, 2004) *aff'd,* 121 F. App'x 1 (4th Cir. 2005). The plaintiff stated that he complained to a manager some two months earlier; however, the plant manager who fired him had no knowledge of the complaint. *Id.* The plaintiff was ultimately fired (and subsequently reinstated with conditions) for the asserted reason of fighting with a co-worker. *Id.* at *1 The *Ford* court then stated that "even if [the plant manager] had known, evidence of causation would be virtually non-existent in light of the intervening fight." *Id.* at *2.

The Court finds the *Horne* and *Ford* cases distinguishable. First, the time period between the protected activity and Plaintiff's firing is far closer than the two month gap in *Horne* and the three year gap in *Ford*. Moreover, unlike the plaintiff in *Horne*, there is no evidence that Plaintiff was told that her employment would be terminated before the protected activity occurred. Finally, Plaintiff was fired by the very supervisor who allegedly perpetrated the conduct that gave rise to this suit.

### B. Defendant has Offered a Legitimate, Non-Discriminatory Reason but Plaintiff Has Provided Sufficient Evidence of Pretext

Defendant offers the Plaintiff's poor performance as evidence that she was terminated for a legitimate, non-discriminatory reason. The Court finds that the facts stated satisfy Defendant's burden of production regarding this issue. *See Evans v. Technologies Applications & Svc. Co.*,

80 F.3d 954, 960 (4th Cir. 1996) ("Job performance . . . [is] widely recognized as [a] valid, non-discriminatory bas[i]s for any adverse employment decision.").

If a Plaintiff satisfies her prima facie case, "the burden then shifts to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). "If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons 'were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 143 (2000)). This method allows a plaintiff to prove causation by circumstantial, as opposed to direct evidence of discriminatory animus. "If a plaintiff can show that she was fired under suspicious circumstances and that her employer lied about its reasons for firing her, the factfinder may infer that the employer's undisclosed retaliatory animus was the actual cause of her termination." *Id.* Plaintiff bears the burden to show "that retaliation was a but-for cause" of her termination." *Id.* at 252. She can do so "by showing that the employer's proffered explanation is unworthy of credence." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)); *see Engler v. Harris Corp.*, No. 14-1444, 2015 WL 5847363, at *2 (4th Cir. Oct. 8, 2015) ("The Supreme Court has made clear that to be pretextual, a reason must be false and wrongful animus must be 'a but-for cause of the challenged employment action.'") (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2532-34 (2013)).

In an attempt to prove that she in fact performed up to standards, Plaintiff offers the following: (1) the product rejections did not increase as shown in the weekly charts for 2012; (2)

Gatrell stated that "'rejects' remained constant for years"; and (3) a highly critical analysis of the inspection process.[10]  The Court will address these contentions in turn.

<u>Product Rejections did not Increase</u>

Plaintiff cites Brian Ernst's deposition to show that product rejections did not increase. Ernst stated that UltraCraft increased the total amount of doors it ordered from Defendant every year since Defendant had them as a customer.  (Ernst Dep., Doc. 30-4, at 139:9-17).  Defendant ultimately lost the Shaker door business from UltraCraft in 2015 and Ernst admitted that Defendant did not lose any Shaker door business due to Plaintiff.  *Id.* at 140:6-23.  Ernst also stated that UltraCraft threatened to take away business but admitted overall business increased. *Id.* at 173:15 – 174:6.  Plaintiff's attorney questioned Ernst about the preparation of the reject numbers and the graph, but it is clear that Ernst did not prepare these documents.  *Id.* at 185:3 – 186:23.  Nevertheless, Ernst ultimately testified that the "24" located on July 31, 2012 in the "2012 UltraCraft Rejects" table relates to the 24 doors that were rejected which, according to Defendant, formed part of the reason for which Plaintiff was fired.  *Id.*  Ernst also addressed the increase in rejects in August and November.  He stated that this resulted from James Scott, the person who took over Plaintiff's position, mistakes during training.  *Id.* at 187:13 – 188:14.[11]

As recounted in the Statement of Facts, Gatrell states that the rejects remained constant. Gatrell also stated that employees told Ernst that doors were defective in some manner but that Ernst told the employees to ship them out despite the issues.  Plaintiff also cites Ernst's deposition to prove that the doors were never shipped a day late.  Plaintiff cites her deposition

---

[10] Plaintiff also appears to make an argument related to whether or not she signed an October 2011 write up, (Doc. 30-1, at 15); however, this is not a material fact.  This does not mean; however, that this evidence could not be introduced at trial.
[11] However, Ernst also stated that fifty doors came back at a later date which would tend to show that the spike recorded in August occurred under Plaintiff's watch.  However, given the standard of review, the Court is required to infer that the spike in August was related to a new employee.

along with Young, Freeman, and Gatrell's to state that people other than Plaintiff "had to inspect the doors also on a weekly basis in order to get the doors loaded and the pallets that were supposed to be shipped that day." (Doc. 30-1, at 17-18). Plaintiff uses this evidence in an attempt to draw the conclusion the normal practice set in place by Ernst was to knowingly ship product with flaws and then see if the customer returns it. (Doc. 30-1, at 16) (citing Gatrell, Freeman, and Young depositions). Plaintiff states that "[i]f there were ever any quality control issues which need to be addressed there would be some days when the orders would be delayed more than a day to address the issues." *Id.*

Young and Freeman were fired before the events that led to Plaintiff's termination. Accordingly, they do not have personal knowledge of these events. They were not even present when Defendant hired Scott to give Plaintiff more time to focus on her inspection duties. Further, Gattrell stated that he had no evidence to show that Woodcraft's explanation of Plaintiff's termination was false and that he did not have any personal knowledge of why she was terminated. (Doc. 30-7, at 84:4, 12).

The Court finds that there are material factual disputes that require this case to go to trial.[12] Viewing the evidence in the light most favorable to Plaintiff, Ernst fabricated a story to his supervisors by stating that Plaintiff knowingly violated company procedure by shipping out doors to a customer knowing that they were defective and that some would be returned. A reasonable jury could conclude that Ernst used the July 30 rejection as a pretense in order to fire Plaintiff for objecting to his sexually inappropriate comment. The fact that other supervisors

---

[12] In so holding, the Court reminds the parties that "[i]n conducting this analysis, the court does not sit to decide whether the defendant in fact discriminated against the plaintiff on the basis of race or gender" but rather must determine if there are material, disputed factual issues. *Holley v. N. Carolina Dep't of Admin., N.C.*, 846 F. Supp. 2d 416, 429 (E.D.N.C. 2012).

concurred in the decision is immaterial because their concurrence was predicated solely on the information provided by Ernst. The evidence submitted could lead a jury to conclude that (1) Ernst routinely pulled his employees, including Plaintiff, away from their assigned tasks and into production; and (2) Ernst routinely told his employees to ship out defective product. Moreover, attorneys for both sides cite the chart "2012 ULTRACRAFT REJECTS" as evidence to support their position. Defendant claims that the Plaintiff inappropriately deposed Ernst regarding this document but at the same time offers the statement of Sheila Krogman, a person who admittedly did not create the chart, to prove that "[t]he July 30, 2012 product rejection by UltraCraft was reflected in the Conover facility's August 2012 recorded rejection numbers, resulting in June and August 2012 showing the highest UltraCraft rejection rates to that point for the 2012 year." (Doc. 21, at ¶ 15). If the Court were not to credit this statement, it would show that the rejection rate was at its lowest when Plaintiff was fired. Furthermore, there has been no testimony establishing when these documents (or prior versions) became available and whether they were even consulted during the discussions that Ernst had with his superiors regarding Plaintiff's termination. Finally, Plaintiff's prior positive reviews could lead a reasonable juror to question the sincerity of the proffered explanation. Accordingly, it is for the jury to determine whether Plaintiff's protected activity was the "but for" cause of her termination. *See Taylor v. Rite Aid Corp.*, 993 F. Supp. 2d 551, 567 (D. Md. 2014) (Precedent does not require "protected activity be the *only* factor that resulted in an adverse action, just that the adverse action would not have occurred without the protected activity.") (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 133 S. Ct. 2517, 2533 (2013)).

Accordingly, summary judgment is **DENIED** as to the retaliation claim.

## V.  STATE LAW CLAIMS

Defendant also moved to dismiss state law claims.  (Doc. 19, at 21-25).  Plaintiff did not respond to this portion of the motion.  Accordingly, the motion is **GRANTED** for the grounds stated in the Summary Judgment Motion and because Plaintiff abandoned these claims.

**IT IS, THEREFORE, ORDERED THAT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT IS GRANTED IN PART AND DENIED IN PART. SPECIFICALLY, THE CASE WILL PROCEED TO TRIAL ON THE RETALIATION CLAIM.  ALL OTHER CLAIMS ARE DISMISSED.**

Signed: February 5, 2016

Richard L. Voorhees
United States District Judge